Slip Op. 17-91

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| TIANJIN WANHUA CO., LTD.,<br><br>                              Plaintiff,<br><br>          v.<br><br>UNITED STATES,<br><br>                              Defendant. | Before: Leo M. Gordon, Judge<br><br>Court No. 15-00190 |

### OPINION and ORDER

[Commerce's remand results sustained.]

Dated: July 24, 2017

        David J. Craven, Sandler, Travis & Rosenberg of Chicago, Illinois, for Plaintiff Tianjin Wanhua Co., Ltd.

        Tara K. Hogan, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC for Defendant United States. On the brief with her were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel on the brief was Nanda Srikantaiah, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce of Washington, DC.

        J. Michael Taylor, Stephen A. Jones, and Mark T. Wasden, King & Spalding of Washington, DC for Defendant-Intervenor Terphane, Inc.

        Jeffrey I. Kessler, Ronald I. Meltzer, Patrick J. McLain, and David M. Horn, Wilmer, Cutler, Pickering, Hale & Dorr, LLP of Washington, DC for Defendant-Intervenors Mitsubishi Polyester Film, Inc. and SKC, Inc.

        Gordon, Judge: This action involves the fifth administrative review conducted by the U.S. Department of Commerce ("Commerce") of the antidumping duty order covering polyethylene terephthalate film, sheet, and strip from the People's Republic of China ("PRC"). See Polyethylene Terephthalate Film, Sheet, and Strip from the People's

Republic of China, 80 Fed. Reg. 33,241 (Dep't of Commerce June 11, 2015) (final results admin. review) ("Final Results") and accompanying Issues and Decision Mem. for Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China, A-570-924 (Dep't of Commerce June 3, 2015), ECF No. 33-3 ("Decision Memorandum").

Before the court are the Final Results of Redetermination ("Remand Results"), ECF No. 71, filed by Commerce pursuant to Tianjin Wanhua Co. v. United States, 40 CIT ___, 182 F. Supp. 3d 1301 (2016), as well as the comments of Plaintiff Tianjin Wanhua Co., Ltd. ("Plaintiff" or "Wanhua"). See Pl.'s Comments on the U.S. Dep't of Commerce's First Remand Redetermination, ECF No. 78 ("Pl.'s Cmts."); see also Def.'s Resp. to Comments to the Remand Redetermination, ECF No. 82 ("Def.'s Resp. Cmts."); Pl.'s Reply to Def.'s Resp. to Remand Comments, ECF No. 88 ("Pl.'s Reply Cmts."). The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012)[1] and 28 U.S.C. § 1581(c) (2012). The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Familiarity with the prior judicial and administrative decisions in this action is presumed.

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

### I. Standard of Review

For administrative reviews of antidumping duty orders, the court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006); see also Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2017). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances

presented by the whole record." 8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2017).

## II. Discussion

### A. Rejection of Data & Economic Comparability

#### 1. Legal Framework

In an antidumping duty administrative review, Commerce determines whether subject merchandise is being, or is likely to be, sold at less than fair value in the United States by comparing the export price and the normal value of the merchandise. 19 U.S.C. §§ 1675(a)(2)(A), 1677b(a). In the non-market economy ("NME") context, Commerce calculates normal value using data from surrogate countries to value the factors of production ("FOPs"). 19 U.S.C. § 1677b(c)(1)(B). Commerce must use the "best available information" in selecting surrogate data from "one or more" surrogate market economy countries. 19 U.S.C. § 1677b(c)(1)(B), (c)(4). Commerce has a stated regulatory preference to "normally . . . value all factors in a single surrogate country." 19 C.F.R. § 351.408(c)(2) (2015).

The antidumping statute requires that surrogate data must "to the extent possible" be from a market economy country or countries that are (1) "at a level of economic development comparable to that of the [NME] country" and (2) "significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4). The statute does not define the phrase "level of economic development comparable to that of the [NME] country," nor does it require Commerce to use any particular methodology in determining whether

that criterion is satisfied. To partially fill the statutory gap, Commerce promulgated 19 C.F.R. § 351.408(b), which emphasizes per capita Gross Domestic Product ("GDP") as a measure of economic comparability:

> In determining whether a country is at a level of economic development comparable to the non-market economy under [19 U.S.C. § 1677b(c)(1)(B)] or [19 U.S.C. § 1677b(c)(4)(A) ] of the Act, the Secretary will place primary emphasis on per capita GDP as the measure of economic comparability.

19 C.F.R. § 351.408(b). Commerce has since explained that it "now uses per capita [Gross National Income, or "GNI"], rather than per capita GDP, because while the two measures are very similar, per capita GNI is reported across almost all countries by an authoritative source (the World Bank), and because [Commerce] believes that the per capita GNI represents the single best measure of a country's level of total income and thus level of economic development." Antidumping Methodologies in Proceedings Involving Non–Market Economy Countries: Surrogate Country Selection and Separate Rates, 72 Fed. Reg. 13,246, 13,246 n.2 (Dep't of Commerce Mar. 21, 2007) (req. for comments).

Commerce uses GNI data "as reported in the most current annual issue of the World Development Report (World Bank)" to identify potential surrogate countries that are economically comparable to the NME country. Import Admin., U.S. Dep't of Commerce, Non–Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 at 2 (2004), http://enforcement.trade.gov/policy/bull04–1.html (last visited this date) ("Policy Bulletin"). The identification of potential surrogate countries occurs early in a

dumping proceeding, id., and is the first step in Commerce's four-step process to select a surrogate country:

> (1) the Office of Policy ("OP") assembles a list of potential surrogate countries that are at a comparable level of economic development to the NME country; (2) Commerce identifies countries from the list with producers of comparable merchandise; (3) Commerce determines whether any of the countries which produce comparable merchandise are significant producers of that comparable merchandise; and (4) if more than one country satisfies steps (1)–(3), Commerce will select the country with the best factors data.

Vinh Hoan Corp. v. United States, 39 CIT ___, ___, 49 F. Supp. 3d 1285, 1292 (2015) (internal quotation marks omitted) (quoting the Policy Bulletin).

## 2. Procedural History

In conducting the fifth administrative review, as it did in the fourth administrative review, Commerce again selected Indonesia as the primary surrogate country for calculating the normal value of polyethylene terephthalate film, sheet, and strip from the PRC, an NME country. Wanhua challenges that selection and contends that Commerce should have instead selected South Africa. See Pl.'s Mem. Supp. Mot. J. Agency R., ECF No. 41 ("Pl.'s 56.2 Br."). The issue of the surrogate country selection turned into something of a mess during the proceeding, a mess that has carried forward into the litigation before the court. Wanhua created that mess by untimely attempting to introduce GNI data for surrogate country selection in a submission for FOP data. Much of Wanhua's briefing and argument concerns alleged unfairness during the proceeding, but the court believes that it was Wanhua that acted inequitably by failing to identify that it was seeking

a waiver of the applicable deadline in its untimely submission of GNI data. More on that after the court explains what transpired below.

Early in the proceeding Commerce issued a "Request for Surrogate Country and Surrogate Value Comments and Information" that solicited from all interested parties submissions of comments and factual information to aid in Commerce's selection of an "appropriate surrogate market economy country." See Fifth Antidumping Duty Admin. Review of Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China, PD 89 at bar code 3195959 (Apr. 16, 2014) (request for cmts.) ("Request for Comments"). The request included a "non-exhaustive list of countries that . . . based on per capita Gross National Income ("GNI"), are at the same level of economic development as the People's Republic of China." Id. (South Africa, Columbia, Bulgaria, Thailand, Ecuador, and Indonesia). The request also set deadlines for the submission of information and comments on surrogate country selection: April 23, 2014 for initial comments on the list and other possibilities, and April 28, 2014 for rebuttal comments. Id. at *1. For comments and information on Commerce's ultimate selection of the surrogate country, Commerce set the deadline of May 7, 2014, with rebuttal comments due by May 19, 2014. Id. at *2. These same deadlines also applied to the submission of information/comments and rebuttal comments relating to Commerce's selection of surrogate value information used to value FOPs. Id. Commerce noted, however, that [n]otwithstanding the above deadlines, in accordance with 19 CFR 351.301(c),

interested parties may submit publicly-available information to value factors of production no later than 30 days before the scheduled date of the preliminary results." Id.

The Request for Comments emphasized Commerce's "practice to determine economic comparability early in a proceeding" and that Commerce "intends to identify the surrogate country preliminarily selected in the preliminary results of this segment of the proceeding." To achieve that end Commerce provided early deadlines for all parties to provide information and comments regarding the surrogate country list and surrogate country selection generally. Id. No party objected to the deadlines provided in the Request for Comments.

On April 23, 2014, Wanhua timely submitted comments "on the those countries which are on a level of economic development comparable to the People's Republic of China." See Wanhua Comments on Economic Comparability & Request for Clarification of Date, PDs 93-97 at bar codes 3197604-01 to -05 (Apr. 23, 2014) (sic). Wanhua acknowledged that the six countries selected by Commerce were "economically comparable" to China, but also argued Commerce should consider India even though India's GNI was much lower than China's and therefore was not on Commerce's preliminary list of comparable countries.  Id. at bar code 3197604-01, *9-10.

Wanhua also noted that GNI data for 2013, rather than 2012, would be more relevant for Commerce's analysis because the 2012 data only overlapped 2 months of the period of review whereas the 2013 data would overlap 10 months. Id. at bar code 3197604-01, *3-4. The 2013 GNI data, however, would not be available until July 2014,

two months _after_ Commerce's May 7th deadline for information and comments on surrogate country selection. Id. Despite suggesting that Commerce should use the 2013 GNI data, Wanhua failed to address the obvious problem that the data was untimely. Id. Wanhua did not request that Commerce waive or extend the deadline. Wanhua also did not argue that the untimely 2013 GNI data could easily be factored into the surrogate country analysis without time-consuming complexity or delay. What Wanhua offered instead was this incomplete thought: "The Department should anticipate the likely data in preparing to make its comparability determination and should not continue to find that a Country is comparable, based on GNI, if the data presented to the Department[.]" Id. (sic).

Subsequently, on May 7, 2014, Wanhua submitted its "Comments on the Selection of Surrogate Country, Submission of Initial Surrogate Value Information and Request for Clarification of Deadline." Wanhua SC/SV Comments, PDs 103-110 at bar codes 3200113-01 to -10 (May 7, 2014). Wanhua acknowledged that it was commenting "on the selection of a surrogate country." Id. at bar code 3200113-01, *1. On economic comparability Wanhua argued that Commerce

> should consider all of the countries that fall within the GNI range, as well as India, to be economically comparable to China with a caveat. The caveat is that the Department must reconsider the economic comparability of Indonesia and the other countries at the bottom edge of the GNI band when the new World Bank data is released which will show that the gap between Indonesia and China will has grown and was significant during the POR.

Id. at bar code 3200113-01, *2 (sic).  Wanhua's argument contains a jarring asymmetry. On the one hand, Wanhua argues that Commerce should ignore GNI differences and select India. On the other, Wanhua argues that Commerce should disqualify Indonesia

based on GNI differences with China. Oblivious to this irreconcilable dissonance, Wanhua goes on to argue the suitability of India and/or South Africa for selection, contending that both countries are significant producers of comparable merchandise and that both countries had readily available, high quality data. Id. at bar code 3200113-01, *2-6.

Wanhua also addressed its data submissions for surrogate values, and noted its intention to submit additional surrogate value information 30 days prior to the scheduled release of the preliminary results. Id. at bar code 3200113-01, *6-7. Wanhua did not notify Commerce or the other interested parties that it intended to submit the untimely 2013 GNI data on surrogate country selection at the same time as its additional surrogate value submission. On July 7, 2014, Wanhua submitted "certain Surrogate Value Information" pursuant to the Request for Comments and 19 CFR § 351.301(c). See Wanhua Rejected Surrogate Value Information, PDs 157-159 at bar codes 3214057-01 to -03 (July 7, 2014) ("the July 7th Submission"). Without highlighting that it was also including untimely information on surrogate country selection, Wanhua included the 2013 GNI data, which, unlike the other information and data included in the submission, were not surrogate FOP values. Id. at bar code 3214057-01, *2 & Ex. 1.

On November 28, 2014, Commerce issued its preliminary results and selected Indonesia as the primary surrogate country, relying on the interested parties' April and May submissions to make the determination. See Decision Memorandum for the Preliminary Results of the 2012-2013 Antidumping Duty Administrative Review of

Polyethylene Terephthalate Film, Sheet, and Strip from the PRC, PD 190 at bar code 3244446 (Nov. 28, 2014). Commerce found that both Indonesia and South Africa were at a comparable level of economic development to the PRC, were significant producers of merchandise similar to the subject merchandise, and offered usable surrogate values. Id. at 7-14. Although the South African producer made "comparable merchandise" such as polyethylene film, the Indonesian producer, made "identical merchandise." Id. at 14. Relying on a "preference for selecting the financial statements of a producer of identical merchandise over a producer of comparable merchandise," Commerce preliminarily selected Indonesia as the primary surrogate country for the administrative review. Id.

Wanhua subsequently submitted its initial administrative case brief on January 14, 2015. Wanhua argued that Commerce should not have selected Indonesia as the surrogate country, but instead should have chosen South Africa (abandoning its argument about India). See Wanhua Administrative Case Brief, PD 209 at bar code 3252778 (Jan. 14, 2015). In its case brief Wanhua directly referenced for the first time the untimely 2013 GNI data Wanhua in its July 7th Submission. See id. at *5-6, *8-10. It appears that Commerce and the other interested parties first became aware of the untimely 2013 GNI data when they read Wanhua's case brief. On March 12, 2015, Commerce issued a letter to Wanhua rejecting the inclusion of the untimely 2013 GNI data within its July 7th Submission. Commerce reasonably noted that the untimely data was related to the selection of surrogate countries with earlier deadlines than the FOP submission of July 7th. See Rejection of Surrogate Information, PD 216 at bar code

3264120 (Mar. 2, 2015). Commerce also rejected Wanhua's January 2015 case brief and requested that Wanhua re-file it after redacting references and arguments relating to the untimely 2013 GNI data. <u>See</u> Rejection of Wanhua Case Brief, PD 223 at bar code 3265209 (Mar. 19, 2015). Wanhua complied with Commerce's request, but also filed a letter objecting to and seeking clarification of Commerce's rejection of the 2013 GNI data and its requirement of redactions to Wanhua's case brief. <u>See</u> Wanhua Request for Clarification of Rejection, PD 224 at bar code 3265244 (Mar. 19, 2015). Wanhua objected that Commerce's rejection of the July 7th Submission was improper and inconsistent with <u>Dupont Teijin Films v. United States</u>, 39 CIT ___, 931 F. Supp. 2d 1297 (2013), in which the court remanded Commerce's surrogate country selection where a party had placed new GNI data on the record and such data was not rejected as untimely but Commerce nevertheless determined the date of the data submission was too late in the review process to merit substantive consideration. <u>See Dupont Teijin Films</u>, 39 CIT at ___, 931 F. Supp. 2d at 1300, 1303-05.

On June 3, 2015, Commerce issued a memorandum explaining again its rejection of the untimely 2013 GNI data as well as responding to Wanhua's objection to the redaction and resubmission requirements for its case brief. <u>See</u> Department Memorandum re: Rejection of Untimely Filed Information, PD 232 at bar code 3281665 (June 3, 2015). Commerce reasonably distinguished the facts in <u>Dupont Teijin Films</u> from those presented in Wanhua's case. Commerce noted that in the current administrative review of polyethylene terephthalate film, sheet, and strip from the PRC, Commerce had

established clear deadlines for factual information submissions relating to surrogate

country selection and surrogate value calculation, whereas no clear deadlines were

present in Dupont Teijin Films. Id. at *2. Commerce also expressly rejected the 2013 GNI

data as untimely, unlike in Dupont Teijin Films where Commerce did not reject as untimely

the GNI data but instead merely found that the submission was too late in the process to

substantively affect the surrogate country selection analysis. Id. at *2-3 ("Regardless,

in this proceeding, unlike in the review underlying Dupont Teijin Films, Wanhua's factual

information was untimely filed pursuant to the deadlines specified by the Department as

well as 19 CFR 351.301."). On June 11, 2015 Commerce issued its Final Results and

calculated antidumping duty rates for Wanhua based on Indonesia as the primary

surrogate country. See Final Results.

Wanhua subsequently commenced this action challenging (1) Commerce's

rejection of the untimely 2013 GNI data, (2) Commerce's rejection and mandated

redactions of Wanhua's administrative case brief and subsequent objection letter, and

(3) Commerce's surrogate country selection. See Pl.'s 56.2 Br. Commerce, in turn,

requested a remand to address its treatment of Wanhua's case brief, and on

August 15, 2016, the court remanded the matter to Commerce. See Tianjin Wanhua Co.

v. United States, 40 CIT ___, 182 F. Supp. 3d 1301 (2016). The court reserved decision

on the lawfulness of Commerce's rejection of the untimely 2013 GNI data. Id. at 1306.

On remand, Commerce softened some of its redactions to Wanhua's case brief, and ultimately chose Indonesia again, rather than South Africa, as the primary surrogate country. Remand Results at 6-9, 11-13.

### 3. Analysis

In writing its case brief before Commerce, Wanhua proceeded on the incorrect assumption that Commerce would use the untimely 2013 GNI data in making its primary surrogate country selection. Wanhua was aware of the deadlines for information relating to Commerce's surrogate country selection.  Wanhua was also aware the 2013 GNI data would not be available until after those deadlines had passed.  Instead of formally objecting to or challenging the deadlines in Commerce's Request for Comments, or seeking a formal acceptance of the untimely 2013 GNI data by Commerce, Wanhua instead merely assumed in its briefing that Commerce would quietly waive its established deadlines and incorporate the 2013 GNI data into its analysis. See Wanhua Comments on Economic Comparability, PDs 93-97 at bar codes 3197604-01 to -05; Wanhua SC/SV Comments, PDs 103-110 at bar codes 320013-01 to -10.

The court cannot understand Wanhua's cavalier assumption about an untimely data submission, especially given the manner in which Wanhua tried to introduce it onto the record. Without a formal acceptance by Commerce of the untimely data, other interested parties would not know to consider that data in their own analyses and argument about surrogate country selection. The result is a fractured administrative record, and Commerce's trade analyst conducting the review is left in an unworkable

situation, with case briefs and arguments that do not line up because the parties are working from differing data sets.

Wanhua attempts to argue that Commerce's rejection of the 2013 GNI data was unreasonable and unfair. See Pl.'s Cmts. 12-23; see also Pl.'s 56.2 Br. 15-18. Wanhua further contends that even if Commerce properly rejected the 2013 GNI data as untimely, Commerce's delay in rejecting the data, and Wanhua's related briefing relying on that data, was fundamentally unfair to Wanhua. See Pl.'s Cmts. 15-17, 32. Wanhua frames this argument as either a "deprivation of due process rights," or alternatively, a violation of the "fair process doctrine" adopted by the U.S. Court of Appeals for the Federal Circuit in Sprinkle v. Shinseki, 733 F.3d 1180 (Fed. Cir. 2013). Id.

The court is not persuaded by these arguments. It is difficult to generate sympathy for Wanhua's lamentations about a lack of fair process given how it handled the untimely 2013 GNI data submission. Rather than challenge the surrogate country selection deadlines directly, and argue that Commerce could not reasonably reject untimely 2013 GNI data covering 10 months of the period of review, Wanhua chose opacity over transparency by including the untimely 2013 GNI data in an FOP submission. In choosing to then incorporate the untimely 2013 GNI data into its case brief without a formal acknowledgment that Commerce would waive the deadlines and accept the data, Wanhua effectively derailed the case brief process, putting Commerce's trade analyst, as well as the other interested parties, in an untenable situation. Wanhua conveniently ignores the resulting unfairness it created by relying on untimely data that no other

interested parties briefed and argued.  If fairness and fair process are truly the guide, the court wonders how Wanhua could reasonably expect Commerce to do anything other than what it did.

Wanhua did not just create procedural confusion below. Wanhua's substantive arguments were also confusing. In its surrogate country selection submissions Wanhua argued that Commerce should select India as the surrogate country, despite India not being included on Commerce's preliminary list of countries economically comparable to China, while simultaneously arguing that Commerce should not select Indonesia because it was <u>not</u> economically comparable to China. The court does not understand how Wanhua could have reasonably expected to prevail on the issue of surrogate country selection given the irreconcilable dissonance of its substantive arguments.

Wanhua also asserts in its remand comments that Commerce acted inconsistently in its treatment of untimely information, but fails to identify any specific prior instance of inconsistent treatment. <u>See</u> Pl.'s Cmts. 17-19. Wanhua attempts to avoid this deficiency by contending that "Wanhua is unable to place on the record new factual information demonstrating this inconsistency or cite to such inconsistency as it would constitute new factual information not of record and the brief would be rejected." <u>Id.</u> at 18. This is a weak apologia for Wanhua failing to provide specific instances of agency inconsistency. A purported inability to submit new factual information does not excuse Wanhua's failure to identify any specific prior instances of inconsistency that Commerce would have to address and explain. As Defendant points out, "Wanhua did not even attempt to articulate

in what way Commerce's rejection of its untimely submitted surrogate country data was inconsistent with prior practice." Def.'s Resp. Cmts. 19. Suffice it to say, Plaintiff's vague argument is unpersuasive. The court sustains Commerce's rejection of Wanhua's untimely 2013 GNI data and Commerce's redaction of Wanhua's case brief.

### B. Financial Statement Quality and Surrogate Country Selection

Wanhua also contends that Commerce unreasonably selected Indonesia as the primary surrogate country despite an alleged lack of quality data. Wanhua argues that Commerce improperly relied upon an incomplete annual report of Indonesian company PT Argha Karya Prima Industry, Tbk ("Argha Karya"), and that the missing data resulting from the incompleteness of the report, coupled with the allegation that Argha Karya's financials are distorted by Indonesian subsidies, rendered Argha Karya's financial statements and the resulting financial ratio unusable, or at least of questionable quality in comparison with available South African data. See Pl.'s 56.2 Br. 23-24, 26-29. In requesting remand on the issue of surrogate country selection, Commerce did not address in its Rule 56.2 brief Wanhua's subsidiary arguments regarding the surrogate country selection issue, including Wanhua's arguments regarding the quality of the Argha Karya data. See Def.'s Mem. Opp'n Pl.'s R. 56.2 Mot. J. Agency R. and Mot. Partial Voluntary Remand 23, ECF No. 51 ("Def.'s 56.2 Resp.") ("In light of our request for a voluntary remand for Commerce to reconsider its treatment of Wanhua's "Request for Clarification of Rejection" letter, we further respectfully request a remand on the issue of surrogate country selection, an issue which Wanhua has challenged in its present brief."

(citing pages 22-28, comprising "Section 3" of Pl.'s 56.2 Br., which addressed Wanhua's challenge to Commerce's selection of Indonesia as the primary surrogate country).

Wanhua now argues that Commerce's failure to respond to its arguments about the Indonesian financial ratio constitutes a waiver. <u>See</u> Pl.'s Cmts. 5-8; <u>see also</u> Pl.'s Reply Cmts. Wanhua specifically argues that it challenged in its opening brief Commerce's determination that the Argha Karya financials were usable and suitable for selection over the South African financial statements, and that Commerce failed to respond to such arguments in any form. <u>See</u> Pl.'s Cmts. 5-7. Wanhua is incorrect. Commerce expressly asked for a remand on the entire issue of surrogate country selection, including the subsidiary issues as to the quality of the Indonesian financial data raised in Section 3 of Wanhua's brief. <u>See</u> Def.'s 56.2 Resp. 23 (requesting remand specifically to address surrogate country selection issues raised in Section 3 of Wanhua's brief). On remand Commerce considered and discussed all of Wanhua's arguments regarding surrogate country selection, including the issues of Argha Karya's financial statements and their impact on surrogate country selection. Defendant did not waive arguments on surrogate country selection.

This Court has previously addressed Wanhua's arguments regarding the weaknesses of the Argha Karya financial report in a case involving a prior administrative proceeding. <u>See</u> <u>Tianjin Wanhua Co. v. United States</u>, 40 CIT ___, 179 F. Supp. 3d 1062, 1068-71 (2016) ("<u>Tianjin I</u>"). In <u>Tianjin I</u>, Wanhua challenged Commerce's selection of Indonesia as the primary surrogate country and Commerce's reliance upon the same

incomplete financial report of Argha Karya used in the fifth administrative review. Wanhua in <u>Tianjin I</u> similarly urged Commerce to instead select South Africa and use the financial statements of the South African company AstraPak. <u>Id.</u> This Court in <u>Tianjin I</u> concluded that although Wanhua raised serious issues about the potential unreliability of Argha Karya's financial report (specifically the report's incomplete nature and the potential distortive effect of Indonesian subsidies on the data), a reasonable mind, and therefore Commerce, could select the Argha Karya data over the AstraPak data given Commerce's uncontroverted finding that the Indonesian company produced <u>identical</u> merchandise, whereas the South African company produced the less exact <u>comparable</u> merchandise. <u>Id.</u> at 1070-71. The court noted that "[f]or the court to remand for Commerce to use the AstraPak dataset, Wanhua needed to establish that AstraPak, when compared with Argha, is the <u>one and only reasonable surrogate selection on this administrative record</u>, not simply that AstraPak may have constituted another possible reasonable choice." <u>Id.</u>, 40 CIT at ___, 179 F. Supp. 3d at 1071 (emphasis added).

In this action Commerce again selected the Argha Karya data set over Wanhua's preferred data set from South African AstraPak, finding that it came from a producer of "identical" merchandise rather than a producer of "comparable" merchandise (Astrapak) and that the Indonesian data was "reliable and usable." <u>See</u> <u>Decision Memorandum</u> at 5--6. Here, Wanhua has failed to grapple with or provide any "analysis of the consequence of 'comparable' vs. 'identical' merchandise on the margin calculation, <u>e.g.</u>, what complexities or difficulties would or would not be engendered[, s]o although the

court may agree that the Argha annual report has weaknesses as a surrogate dataset, the court cannot evaluate those weaknesses against the noted weaknesses of the AstraPak dataset because Wanhua did not provide any comparative analysis." Id. 40 CIT at ___, 179 F. Supp. 3d at 1070-71. Misreading the court's decision in Tianjin I, Wanhua asserts that the financial ratio derived from the Argha Karya financial record is "unusable" and that the unsuitability of the Indonesian financial ratio has even been established as a "key fact of record." See Pl.'s Cmts. 4, 8-9. Wanhua suggests that the only reason this Court sustained Commerce's use of the Argha Karya financial ratios in the fourth administrative review was because "the usability of the South African ratios had not been established." Id. at 7. Although Wanhua provides some additional detail on why the South African AstraPak data may be reliable and complete and another reasonable choice available to Commerce, Wanhua has still failed to undertake a comparative analysis or provide an explanation about whether the relative advantages of using a producer of identical merchandise (Indonesian Argha Karya) are outweighed by using a less specific producer of "comparable" merchandise (South African Astrapak) to demonstrate that AstraPak is the "one and only reasonable surrogate selection." Tianjin I, 40 CIT at ___, 179 F. Supp. 3d at 1071.

The court therefore sustains Commerce's selection of Indonesia as the primary surrogate country.

### III. Conclusion

For the foregoing reasons, the <u>Remand Results</u> are sustained.  Judgment will be entered accordingly.


_____/s/ Leo M. Gordon_____
Judge Leo M. Gordon


Dated: July 24, 2017
        New York, New York